NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0095n.06

Case No. 21-5651

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Mar 03, 2022
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| DANA CAMPBELL, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF KENTUCKY |
| HARTFORD LIFE & ACCIDENT INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant-Appellant. | ) | OPINION |
| | ) | |

Before: McKEAGUE, BUSH, and READLER, Circuit Judges.

McKEAGUE, Circuit Judge. In this ERISA action, Defendant Hartford Life & Accident Insurance Company appeals the district court's order reversing Hartford's decision to deny Plaintiff Dana Campbell's benefits claim and to rescind life insurance coverage based on a material misrepresentation in the insurance application. The district court reviewed Hartford's decision de novo over Hartford's contention that the deferential arbitrary-and-capricious standard applied. Because we agree with Hartford that arbitrary-and-capricious review applies, and because its rescission of coverage was not arbitrary and capricious, we reverse.

I.

Hartford Life & Accident Insurance Company issued a life insurance policy to Dana Campbell's employer as part of the company's employee benefit plan. That policy gave employees

like Campbell the option to elect supplemental dependent life insurance coverage. Campbell elected to obtain that coverage for her husband, Gary Campbell, in 2015.

The supplemental dependent life insurance coverage offered by Hartford included a "Guaranteed Issue Amount" of $10,000 and an additional "Maximum Amount" of $190,000. The Guaranteed Issue Amount did not require evidence of insurability, but the Maximum Amount did. To obtain coverage for the Maximum Amount, Mr. Campbell had to complete a personal health application. Pertinent to this appeal, Question 4 on the application asked:

> Within the past 5 years, have you used any controlled substances, with the exception of those taken as prescribed by your physician, **been diagnosed or treated for drug or alcohol abuse (excluding support groups)**, or been convicted of operating a motor vehicle while under the influence of drugs or alcohol?

A.R. 840 (emphasis added). In response to this question, Mr. Campbell checked "No." *Id.*

The Campbells submitted the application in November of 2015. Hartford approved coverage and issued Mrs. Campbell a Certificate of Insurance in a packet titled "Your Benefit Plan." The certificate states: "The provisions of The Policy, which are important to You, are summarized in this certificate consisting of this form and any additional forms which have been made a part of this certificate." *Id.* at 13. The certificate is then incorporated into the policy through a separate document amending the policy. R. 24-3 at 9. Important here, the certificate contains the following clause:

> **Policy Interpretation:** *Who interprets the terms and conditions of The Policy?*
> We have full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of The Policy. This provision applies where the interpretation of The Policy is governed by the Employee Retirement Income Security Act of 1974, as amended (ERISA).

A.R. 29. The certificate also has an "Incontestability" clause, which specifies that, "[i]n the absence of fraud[,]" life insurance benefits "cannot be contested after two years from its effective date." *Id.*

In April of 2016, Mr. Campbell was diagnosed with esophageal cancer. When Mr. Campbell was diagnosed, his oncologists noted "prior alcohol abuse" and that he had a "[h]istory of alcohol abuse." *Id.* at 465, 479, 483. His medical records revealed a struggle with alcohol use in the year preceding the Campbells' application for supplemental life insurance coverage. In March 2015 while visiting his physician, Dr. Dionisio, Mr. Campbell revealed that he had been drinking heavily over the weeks prior to the visit and that he stopped attending Alcoholics Anonymous meetings because of his drinking. Mr. Campbell reported to Dr. Dionisio that Mrs. Campbell told him to stop drinking or she would divorce him and asked Dr. Dionisio to prescribe him the drug Antabuse. Dr. Dionisio found that Mr. Campbell's hypertension was "[u]ncontrolled due to excessive alcohol use" and diagnosed him with "alcohol dependence (303.90)." *Id.* at 716–18. Dr. Dionisio then referred Mr. Campbell to a psychiatrist for treatment. Two months later, in May 2015, Mr. Campbell returned to Dr. Dionisio's clinic but met with a different physician, Dr. Williams. Mr. Campbell told Dr. Williams that the previous week he "went on a tear" and that he can "control urges to drink" for a few weeks and then "will try to have 'Just a couple of drinks' but can't limit it to that." *Id.* at 712. He again relayed that he feared "los[ing his] marriage over this." *Id.* Dr. Williams also diagnosed Mr. Campbell with "alcohol dependence (303.90)." *Id.* at 714. Dr. Williams prescribed him a "low dose of Topamax for 1 month." *Id.* at 714. And Dr.

Williams instructed Mr. Campbell to follow up with Dr. Dionisio in one month, to continue going to AA, and to continue seeing a counselor.

Mr. Campbell died of cancer on December 20, 2016. Mrs. Campbell then sought life insurance benefits under the policy at issue in this case. Because Mr. Campbell's death occurred within two years of the effective date of coverage (meaning that the "Incontestability" clause did not apply), Hartford obtained Mr. Campbell's medical records and reviewed his answers on the personal health application.

After obtaining Mr. Campbell's records, Hartford referred them to its medical underwriting unit. The medical underwriting unit determined that, had Hartford had access to Mr. Campbell's medical records, it would not have approved supplemental dependent life insurance coverage based on Mr. Campbell's "treatment of alcohol abuse" in May 2015. On April 3, 2017, Hartford informed Mrs. Campbell that her claim for claim for benefits had been denied, coverage had been rescinded, and that she had 60 days to appeal. Hartford indicated that it rescinded coverage based on Mr. Campbell's "incorrect and untrue" answer of "No" to Question 4 on the personal health application. *Id.* at 96.

Mrs. Campbell administratively appealed the decision in May of 2017. In support of her appeal, she submitted a letter from Dr. Dionisio explaining that in Mr. Campbell's March 2015 visit, he was "referred but never sought treatment for alcohol use." *Id.* at 369. Hartford maintained its decision to rescind coverage, pointing to its April 3, 2017 letter, in which it stated that it relied on the records from Mr. Campbell's May 2015 visit with Dr. Williams for its finding that Mr. Campbell had been treated for alcohol abuse.

Mrs. Campbell appealed again in October of 2017. This time, she pointed out that "alcohol dependence" and "alcohol abuse" were two separate diagnoses as defined in the DSM-IV.

Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders Text Revision* 213–14 (4th ed. 2000). "Alcohol Dependence (303.90)"—Mr. Campbell's diagnosis—is defined in the DSM-IV as a "maladaptive pattern of [alcohol] use, leading to clinically significant impairment or distress, as manifested by three (or more) of" a list of seven symptoms "occurring at any time within the same 12-month period." *Id.* at 197, 213. "Alcohol Abuse (305.00)" is defined as "[a] maladaptive pattern of [alcohol] use, leading to clinically significant impairment or distress, as manifested by one (or more) of" a list of four symptoms "occurring within a 12-month period"; *and* that "[t]he symptoms have never met the criteria for [Alcohol] Dependence." *Id.* at 199, 214.

Hartford upheld its decision on February 1, 2018, indicating that Mrs. Campbell's administrative remedies had been exhausted. She then filed this suit, which arises under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1132(a)(1)(B). At the district court, Mrs. Campbell argued for the first time that the certificate of insurance and the "Your Benefit Plan" packet was not part of the policy and was only a summary document. In response, Hartford submitted a separate amendment that incorporated the certificate into the policy, which had not been part of the administrative record. The district court acknowledged the policy amendment, stating that the certificate "is intended to be part of the Plan." R. 26 at 21–23. But the court concluded that it could not treat the policy amendment as part of the plan because the amendment—the only evidence that the certificate was incorporated into the policy and not merely a summary document—was not part of the administrative record. The court proceeded to review de novo Hartford's decision to rescind coverage and reversed Hartford's decision, ordering Hartford to pay the $190,000 in supplemental benefits. Hartford now appeals.

II.

ERISA gives benefits-plan participants a ticket to federal court to "recover benefits due" under the plan. 29 U.S.C. § 1132(a)(1)(B). In the typical case challenging a plan administrator's denial of benefits, "the validity of a claim to benefits . . . turn[s] on the interpretation of terms in the plan at issue." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Before a court interprets terms in the plan, it must determine whether any deference is owed to the administrator's decision denying benefits. *See id.* at 113–15. That determination turns on whether the plan gives the administrator "the discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115. If the plan grants the administrator such discretion, then the court reviews the administrator's denial of benefits under the arbitrary-and-capricious standard. *Davis v. Hartford Life & Accident Ins. Co.*, 980 F.3d 541, 545 (6th Cir. 2020) (quoting *Bruch*, 489 U.S. at 115); *Hogan v. Life Ins. Co. of N. Am.*, 521 F. App'x 410, 414 (6th Cir. 2013) (citing *Bruch*, 489 U.S. at 113–15). If the plan does not grant the administrator discretion, then the court reviews the administrator's denial of benefits de novo. *Bruch*, 489 U.S. at 115; *Wallace v. Oakwood Healthcare, Inc.*, 954 F.3d 879, 889–90 (6th Cir. 2020). Both the standard of review and the district court's interpretation of the plan are at issue in this appeal.

A.

We review de novo a district court's determination of the proper standard of review to apply to an administrator's decision denying benefits. *Sanford v. Harvard Indus., Inc.*, 262 F.3d 590, 595 (6th Cir. 2001). The certificate of insurance Hartford issued to the Campbells contains a provision stating that Hartford has "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of The Policy." The certificate by itself appears to be only a summary document, and summary documents ordinarily "do not

themselves constitute the *terms* of the plan[.]" *CIGNA Corp. v. Amara*, 563 U.S. 421, 438 (2011). However, the certificate is incorporated into the policy (and therefore the plan) through a separate amendment to the policy. The plan thus gives Hartford discretionary authority, so arbitrary-and-capricious review applies when reviewing Hartford's decision to rescind Campbell's supplemental life insurance coverage. *See Bruch*, 489 U.S. at 115.

Campbell, relying on the district court's reasoning, argues that the certificate cannot be treated as a plan document. If the certificate is not a plan document, then the plan contains no language granting Hartford discretion to construe plan terms, meaning that Hartford would not be entitled to arbitrary-and-capricious review. The district court recognized that the certificate, and therefore the language granting Hartford discretion, "is intended to be part of the Plan." The court nonetheless applied de novo review, reasoning that it could not treat the certificate as part of the plan because Hartford failed to make the amendment part of the administrative record. The court based this conclusion on the rule that says a court "may not consider new evidence or look beyond the record that was before the plan administrator." *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 616 (6th Cir. 1998). The district court was mistaken for two reasons.

First, the district court's reliance on that rule was misplaced. The "rule preventing a reviewing court from considering evidence outside the administrative record does not preclude consideration of the plan documents." *Brooking v. Hartford Life & Accident Ins. Co.*, 167 F. App'x 544, 547 n.4 (6th Cir. 2006) (citing *Bass v. TRW Employee Welfare Benefits Trust*, 86 F. App'x 848, 851 (6th Cir. 2004)). The administrative record rule was "developed to prevent federal courts from becoming substitute plan administrators"—a "concern [] not implicated in cases where the extraneous evidence being offered goes to a question that was not, or could not have been, under consideration by the plan administrator": determining "which standard of review [is]

applicable in federal court." *Daniel v. UnumProvident Corp.*, 261 F. App'x 316, 318 (2d Cir. 2008) (citations and quotation marks omitted); *see also Perry v. Simplicity Eng'g Inc.*, 900 F.2d 963, 966 (6th Cir. 1990) (explaining the origins of the administrative record rule).

This conclusion intuitively follows from the fact that "the benefits plan itself . . . is in the nature of a contract." *See Bass*, 86 F. App'x at 851 (citing *Cassidy v. Akzo Nobel Salt, Inc.*, 308 F.3d 613, 615 (6th Cir. 2002)). Consequently, the administrator's discretion, if any, must come from the plan's terms. *See Bruch*, 489 U.S. at 111–12 ("The terms of trusts created by written instruments are determined by the provisions of the instrument . . . ." (quotation marks omitted)). Campbell's suggestion—that a plan administrator's failure to file the entire plan in the administrative record constructively discharges the omitted portions of the plan—is legally unfounded. In effect, that view transforms a judge-made procedural limit on the scope of judicial review into a substantive rule of contract law. And it violates our time-honored rule that a district court must enforce a benefit plan's unambiguous plain language. *See Clemons v. Norton Healthcare Inc. Ret. Plan*, 890 F.3d 254, 269 (6th Cir. 2018). Thus, because the amendment is a plan document, the court erred in not considering it even though it was not part of the administrative record.

Second, Hartford rightfully points out the "Your Benefit Plan" packet containing the certificate is the only document that contains substantive terms of the plan. It is this document that Campbell expressly relies on for her claim to benefits. Campbell cannot, on the one hand, claim entitlement to benefits using this document while, on the other hand, claim that the certificate is not a plan document for purposes of obtaining a favorable standard of review. *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("[J]udicial estoppel generally prevents a party from prevailing

in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." (citation omitted)).

Campbell also argues that, even if the plan grants discretion to Hartford to interpret terms of the plan and determine eligibility for benefits, de novo review is still appropriate because the plan does not grant Hartford discretion to rescind coverage. However, under federal common law applicable in ERISA cases, an administrator may rescind coverage based on a material misrepresentation made in the insurance application. *Davies v. Centennial Life Ins. Co.*, 128 F.3d 934, 943–44 (6th Cir. 1997), *overruling in part on other grounds recognized by Johnson v. Conn. Gen. Life Ins. Co.*, 324 F. App'x 459, 463 (6th Cir. 2009); *see also Johnson*, 324 F. App'x at 467 (applying arbitrary-and-capricious review to administrator's decision to rescind coverage based on alleged misrepresentation); *Metro. Life Ins. Co. v. Conger*, 474 F.3d 258, 267 (6th Cir. 2007) (same); *Shipley v. Arkansas Blue Cross & Blue Shield*, 333 F.3d 898, 902 (8th Cir. 2003) ("[W]e, like a number of our sister circuits, conclude that federal common law allows for the equitable rescission of an ERISA-governed insurance policy that is procured through the material misstatements or omissions of the insured."). And here, Hartford based its rescission on its determination that checking "No" in response to Question 4 of Mr. Campbell's application was a material misrepresentation. That document, too, was incorporated into the policy. Thus, Hartford had discretion to "construe and interpret" terms in the application as with the other provisions of the policy.

Campbell raises two procedural arguments, but neither is persuasive. She first urges us to disregard the declaration of Scott Briere. Hartford used Briere's declaration at the district court to introduce the plan amendment proving that the certificate was incorporated into the policy. Campbell claims that, because Briere was the underwriter who made the decision to rescind

coverage, we must disregard Briere's declaration on conflict-of-interest grounds. But the conflict-of-interest caselaw on which Campbell relies deals with conflicts of interest in an administrator's decision to deny benefits, *see Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 167 (6th Cir. 2007), and Campbell does not challenge the legitimacy of the amendment. She also argues that Hartford forfeited the argument that the court should consider documents outside the administrative record because it did not properly raise that argument before the district court. *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 551–54 (6th Cir. 2008). But Hartford introduced the plan amendment at the first opportunity to rebut Campbell's challenge that the certificate was not part of the policy and the district court addressed Hartford's argument at length in its opinion. Hartford did not forfeit this argument.

In sum, the certificate granting Hartford discretion to interpret plan terms was incorporated into the policy (and therefore, the plan). Thus, Hartford is entitled to arbitrary-and-capricious review of its decision to rescind Campbell's supplemental life insurance coverage.

B.

"The district court's application of an incorrect standard of review . . . does not necessarily compel remand." *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381 (6th Cir. 1996) (citation omitted). For "[h]ad the district court applied the correct standard, we would still review de novo its holding regarding whether the plan administrator's decision to deny benefits was arbitrary and capricious." *Id.* (citations omitted). And because the parties briefed the issue of whether Hartford's rescission was arbitrary and capricious, we proceed to review Hartford's decision under the arbitrary-and-capricious standard and conclude that Hartford's rescission of coverage was not arbitrary and capricious.

Under the arbitrary-and-capricious standard, "we must decide whether the plan administrator's decision was rational in light of the plan's provisions." *Shelby Cnty. Health Care Corp. v. S. Council of Indus. Workers Health & Welfare Tr. Fund*, 203 F.3d 926, 933 (6th Cir. 2000) (citation and internal quotation marks omitted). "A decision is not arbitrary and capricious if it is based on a reasonable interpretation of the plan" and if it is supported by substantial evidence. *Id.* (citing *Johnson v. Eaton Corp.*, 970 F.2d 1569, 1574 (6th Cir. 1992)); *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 617 (6th Cir. 2006).

Federal common law rules control our interpretation of terms in an ERISA plan, "tak[ing] direction from both state law and general contract law principles." *Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 556 (6th Cir. 1998) (en banc) (citations omitted). "The general principles of contract law dictate that we interpret the Plan's provisions according to their plain meaning." *Id.* (citation omitted). And, as discussed earlier, an administrator may rescind coverage if the insured made a material misrepresentation in the insurance application. *Davies*, 128 F.3d at 943. A misrepresentation is "material" if it "materially affects the insurer's risk or the hazard assumed by the insurer." *Id.* (citation omitted).

With these principles in mind, we turn to the issue here: whether it was arbitrary and capricious for Hartford to rescind coverage on grounds that the Campbells made a material misrepresentation. It was not. Based on an ordinary understanding of "alcohol abuse" and the evidence before the administrator detailing the treatment Mr. Campbell received for excessive use of alcohol, the administrator rationally determined that checking "No" to Question 4 was a material misrepresentation.

Start with the ordinary meaning of "abuse." "Abuse" means "improper or excessive use or treatment." "Abuse." *Merriam-Webster.com*, https://www.merriam-

webster.com/dictionary/abuse (Jan. 27, 2022). "Alcohol" abuse then, given its plain meaning "as it would be construed by an ordinary person[,]" *Shelby Cnty. Health Care Corp.*, 203 F.3d at 934, means the "excessive use" of "alcohol."

The record contains ample evidence that Mr. Campbell was "treated" for "abuse"—or "excessive use"—of alcohol in the year prior to applying for life insurance. In March of 2015, Mr. Campbell's physician found that his hypertension was "[u]ncontrolled due to excessive alcohol use[.]" A.R. 718. That physician diagnosed him with "alcohol dependence" and referred him to a psychiatrist. Two months later, Mr. Campbell saw another physician to whom he relayed that he could not control his alcohol intake when he tried to have "[j]ust a couple drinks" and that he feared losing his marriage over his struggle with alcohol. *Id.* at 712. The physician discussed treatment options with Mr. Campbell, diagnosed him with "alcohol dependence" and prescribed a one-month course of Topamax. *Id.* at 712–14.

Considering these facts, Hartford rationally concluded that Mr. Campbell had been "diagnosed or treated" for "alcohol abuse" and that the Campbells therefore made a misrepresentation by representing on the application that he had not. And this misrepresentation was "material." *Davies*, 128 F.3d at 943 ("Insurance companies seek a wealth of health history information from applicants because that information is extremely important to the underwriting decision.").

Campbell pushes back, arguing that the term "alcohol abuse" as used in the personal health application should be given its technical meaning as defined in the DSM-IV. Under this definition of "alcohol abuse," Campbell contends, Mr. Campbell did not make a misrepresentation because his doctors diagnosed him with "alcohol dependence"—a diagnosis distinct from "alcohol abuse"

in the DSM-IV. While this reading of "alcohol abuse" is plausible, it confronts a few insurmountable hurdles.

First, under arbitrary-and-capricious review, we must defer to an administrator's "reasonable interpretation" of the plan. *Shelby Cnty. Health Care Corp.*, 203 F.3d at 933. And giving "alcohol abuse" its ordinary meaning was reasonable. *See id.* (citation omitted) ("a plan administrator must adhere to the plain meaning of its language, as it would be construed by an ordinary person."). The context of the personal health application does not suggest that "alcohol abuse" should be given a technical meaning. *See* Antonin Scalia & Brian Garner, *Reading Law: The Interpretation of Legal Texts* 69 (2012) ("Words are to be understood in their ordinary, everyday meanings—unless the context indicates that they bear a technical sense."). Question 4 asked whether the applicant has been "diagnosed or treated for drug or alcohol abuse[.]" But "drug abuse" is not a condition defined in the DSM-IV, so it would be odd to give "drug abuse" its plain meaning and "alcohol abuse" it's DSM-IV definition, absent some other indication that "alcohol abuse" should be interpreted different from its counterpart in the same sentence.

Second, even if we read "alcohol abuse" as having its DSM-IV definition, Hartford's decision withstands arbitrary-and-capricious review. True, Mr. Campbell was diagnosed with "alcohol dependence" by his physicians and not "alcohol abuse." But the DSM-IV can be reasonably read to cut against Campbell even on this technical reading. The American Psychiatric Association has explained that, "[i]n DSM-IV, the distinction between abuse and dependence was based on the concept of abuse as a mild or early phase and dependence as the more severe manifestation." Am. Psychiatric Ass'n, *Substance-Related and Addictive Disorders* (2013). The DSM-5, published in 2013, combined "alcohol abuse" and "alcohol dependence" into a single diagnosis called "alcohol use disorder"—retaining the "alcohol dependence" diagnostic code

(303.90) for "moderate" or "severe" alcohol use disorder and the "alcohol abuse" diagnostic code (305.00) for "mild" alcohol use disorder. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 490–91, 841 (5th ed. 2013). Thus, even if "alcohol abuse" as used in Question 4 could only be read to mean its DSM-IV definition, Hartford reasonably concluded that Mr. Campbell had been "diagnosed or treated" for "alcohol abuse" based on the evidence that he was treated for the severe manifestation of alcohol abuse. Indeed, Mr. Campbell's oncologists noted in 2016 that he had a history of "alcohol abuse" but did not make mention of "alcohol dependence" despite the technical distinction that Mr. Campbell had been diagnosed with "alcohol dependence." A.R. 465, 479.

Next, Campbell contends that answering "No" was not a material misrepresentation because it was made in good faith. While there is nothing in the record impugning the Campbells' good faith, an "insured's good faith is irrelevant" to the materiality analysis. *Davies*, 128 F.3d at 943. Campbell falls back on the "Incontestability" clause of the policy, which states that benefits "cannot be contested after two years from its effective date . . . [i]n the absence of *fraud* . . . ." A.R. 29 (emphasis added). However, it is undisputed that Hartford rescinded coverage within two years from the effective date of the policy, meaning that the incontestability clause did not apply, so Hartford did not need to find that the misrepresentation was fraudulent.

Finally, Campbell urges that Hartford could not rely on the alleged misrepresentation to rescind coverage because she was never given a copy of it, which the incontestability clause requires. But, as just discussed, Hartford rescinded coverage before the incontestability clause became effective. In any event, Campbell concedes that Scott Briere's declaration establishes that she had the opportunity to print the electronic health questionnaire both before and after she submitted it. And contrary to Campbell's suggestion that we may not consider Briere's declaration

because it falls outside the administrative record, the administrative record rule does not apply when "evidence is necessary to resolve an ERISA claimant's procedural challenge to the administrator's decision." *Wilkins*, 150 F.3d at 618. As a result, Campbell's invocation of the incontestability clause lacks merit.

In sum, Hartford's decision to rescind supplemental dependent life insurance coverage based on what it concluded was a material misrepresentation made in Mr. Campbell's insurance application was not arbitrary and capricious.

\* \* \*

We REVERSE the district court's award of benefits and REMAND with instructions to enter judgment in favor of Hartford.